IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

_____

| | | |
|---|---|---|
| ADVOCARE INTERNATIONAL L.P., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| HORIZON LABORATORIES, INC., | * | |
| RICHARD PAUL SCHECKENBACH | * | |
| R-SQUARED NUTRITION, INC., and | * | |
| HERBASIA CORPORATION, | * | Civil No. 3:04-CV-1988-H |
| | * | |
| Defendants, | * | |
| | * | |
| v. | * | |
| | * | |
| ROBERT HACKMAN and LEXINGTON | * | |
| INSURANCE COMPANY, | * | |
| | * | |
| Third-Party Defendants. | * | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants Richard Scheckenbach and R-Squared Nutrition, Inc.'s Motion for Partial Summary Judgment, filed April 26, 2005; Plaintiff's Response, filed May 18, 2005; and Defendants' Reply, filed June 3, 2005. For the reasons stated below, Defendants' Motion is **GRANTED** in part and **DENIED** in part. Also before the Court is Defendants Richard Scheckenbach and R-Squared Nutrition, Inc.'s Objections to Advocare's Summary Judgment Evidence, filed June 3, 2005. Because the Court did not consider the evidence to which Defendants object, Defendants objections are **OVERRULED.**

I.      **Background**

Since 1993, Plaintiff had engaged the services of Defendant Richard Scheckenbach ("Scheckenbach") as a consultant.[1]  (Def.'s Mot. at 6.)  The consulting agreement (the "contract"), which is the subject of this suit, "is conditioned on [(1) Plaintiff] being the exclusive recipient of Scheckenbach's services [and (2)] Scheckenbach not accepting or receiving any gratuities, commissions, or fees from [Plaintiff's] direct suppliers . . . or manufacturers . . ., paid or offered in conjunction with [Plaintiff's] business except for those monies received by Scheckenbach from R[-Squared.]" (Def.'s App. at 102.)

During his tenure as Plaintiff's consultant, but as a matter of personal business and independent of his contractual duties, Scheckenbach formed various companies ("sourcing companies") which sold raw materials to Defendant Horizon Laboratories, Inc. ("Horizon").[2]  (*Id*. at 155-58; 4th Am. Answer at 4.)  Horizon is one of Plaintiff's manufacturers.  (Pl.'s 1st Am. Compl. at 4.)  Through his sourcing companies, Scheckenbach profited from the sale of goods to Horizon. (Def.'s Br. at 4.)

Plaintiff's causes of action arise out of Scheckenbach's allegedly improper receipt of monies from Horizon.  (Pl.'s 1st Am. Compl. at 6-7, 9-10.)  Plaintiff argues that such receipts violate the contract because they constitute monies received from Plaintiff's manufacturer, paid in conjunction with Plaintiff's business.  (*Id*. at 9.)  Plaintiff also argues that Scheckenbach's receipt of monies from his sourcing companies constitute monies received from Plaintiff's direct suppliers.

---

[1]  Under the agreement, R-Squared Nutrition, Inc. ("R-Squared") contracted Scheckenbach's services to Plaintiff.  R-Squared is wholly owned by Scheckenbach (Def.'s App. at 130).

[2]  Scheckenbach's sourcing companies include: Biosport USA ("Biosport"); Breakthrough Nutrition ("Breakthrough"); Transglobal Resources, Inc. ("Transglobal"); Fife & Taylor Phytochemica, Inc. ("Phytochemica"); and HerbAsia Corporation ("HerbAsia").

Finally, Plaintiff alleges causes of action for statutory indemnity.[3] TEX. CIV. PRAC. & REM. CODE § 82.002 (West 2005).

Scheckenbach counterclaims for breach of contract because Plaintiff terminated the contract on August 29, 2004, with an outstanding balance due.  (Def.'s 4th Am. Answer and Countercl. at 8; Pl.'s App. at 7 (Kugler Aff. ¶ 13), 23.)  Scheckenbach also counterclaims for indemnity based on (1) Plaintiff's company regulations and (2) an indemnity letter provided to Scheckenbach in his capacity as a member of Plaintiff's Scientific and Medical Advisory Board. (Def.'s 4th Am. Answer and Countercl. at 9.)  With the exception of his counterclaim for fraud, Scheckenbach moves for summary judgment as to his claims against Plaintiff as well as all claims against him.  (Def.'s Mot. at 1.)

## II.    Standard

Summary judgment is appropriate where the facts and law as represented in the pleadings, affidavits, and other summary judgment evidence show that no reasonable trier of fact could find for the nonmoving party as to any material fact.  FED. R. CIV. P. 56; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Innovative Database Sys. v. Morales*, 990 F.2d 217 (5th Cir. 1993).  "The moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case." *Lynch Prop., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 322-25).

---

[3] Plaintiff and Scheckenbach are each named as defendants in various products liability actions for harm allegedly caused by Plaintiff's products containing Ephedra. (Pl.'s 1st Am. Compl. at 11-15; Def.'s 4th Am. Answer and Counterclaim at 9.) Each party seeks indemnity from the other in the Ephedra litigation. (Pl.'s 1st Am. Compl. at 11-15; Def.'s 4th Am. Answer and Counterclaim at 9.)

The moving party may meet its initial burden "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. If the movant meets its burden, the nonmovant must go beyond the pleadings and designate specific facts showing that a genuine issue of material fact exists for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998). A party opposing summary judgment may not rest on mere conclusory allegations or denials in its pleadings unsupported by specific facts presented in affidavits opposing the motion for summary judgment. *See* FED. R. CIV. P. 56(e); *Lujan*, 497 U.S. at 888; *Hightower v. Texas Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995). If the movant fails to meet its initial burden, the motion must be denied, regardless of the nonmovant's response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

In determining whether genuine issues of material fact exist, "[f]actual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists." *Lynch*, 140 F.3d at 625; *see also Eastman Kodak v. Image Technical Servs.*, 504 U.S. 451 (1992). However, in the absence of any proof, the Court will not assume or sift through the record to find that the nonmoving party could or would prove the necessary facts. *See Lynch*, 140 F.3d at 625; *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). A party must do more than simply show some "metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Friou v. Phillips Petroleum Co.*, 948 F.2d 972, 974 (5th Cir. 1991).

## III.    Analysis

Plaintiff asserts five claims against Scheckenbach: breach of contract; breach of fiduciary duty; fraud; unjust enrichment; and indemnity. (Pl.'s 1st Am. Compl. at 9-15.) In addition

4

to moving for summary judgment as to Plaintiff's claims, Scheckenbach seeks summary judgment as to his counterclaims for breach of contract and indemnity. (Def.'s Mot. at 1.) The Court analyzes each of Plaintiff's claims in turn before analyzing Defendant's counterclaims.

### A.    Plaintiff's Claims

### 1.    Breach of Contract

Plaintiff alleges that Scheckenbach breached the contract by receiving monies from Plaintiff's direct suppliers and Horizon. (Pl.'s 1st Am. Compl. at 9.) Scheckenbach argues that his sourcing companies were not Plaintiff's "direct suppliers", and therefore his receipts from these entities does not constitute a breach. (Def.'s Br. at 2-3.) With respect to Scheckenbach's payments from Horizon: Plaintiff argues, that by receiving *any* money from Horizon, he is in breach (Pl.'s Resp. at 7); Scheckenbach reads the contract as only prohibiting him from receiving, specifically, "gratuities, commissions, or fees" from Horizon. (Def.'s Br. at 2.)

### a.   Payments from Scheckenbach's Sourcing Companies

Undisputed is Plaintiff's allegation that Scheckenbach's sourcing companies supplied Horizon with raw materials for the manufacture of Plaintiff's products. (Def.'s Br. at 2-4.) Scheckenbach also admits that he received income from his sourcing companies. (Def.'s Reply at 5.) The parties dispute whether such receipts are prohibited under the contract. Scheckenbach argues that his sourcing companies are not Plaintiff's direct suppliers and therefore the receipts are not prohibited. The Court agrees.

"Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Valence Operating Co. v. Dorsett*, — S.W.3d —, 2005 WL 1186289, *4 (Tex. May 20, 2005) (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). Plaintiff admits that the contract "does not define what constitutes a direct supplier, [either explicitly,] by illustration or [by]

example." (Pl.'s Resp. at 11.)  Nor is there any summary judgment evidence indicating that there is a common industry understanding of the term "direct supplier" different than its plain, ordinary, and generally accepted meaning.  *See Zurich Am. Ins. Co. v. Hunt Petroleum (AEC), Inc.*, 157 S.W.3d 462, 465 (Tex. App.–Houston [14 Dist.] Nov 24, 2004).

Other than pointing to the contract, neither party provides summary judgment evidence supporting their respective interpretation of "direct supplier."  Plaintiff argues that "any provider of ingredients and any packer involved in the finished product is a direct supplier to [Plaintiff]."  (Pl.'s Resp. at 11.)  Yet Plaintiff's own pleadings describe its indirect relationship to Scheckenbach's sourcing companies: Plaintiff's complaint alleges that Scheckenbach procured raw materials then sold those materials to Horizon (for use in the manufacture of Plaintiff's products). (Pl.'s 1st Am. Compl. at 6; Def.'s App. at 155; Pl.'s App. at 40.)  Therefore Horizon stood as an intermediary between Plaintiff and Scheckenbach's sourcing companies.  (Def.'s App. at 155, 157-58, 179.)  There is no summary judgment evidence that Scheckenbach or his sourcing companies directly supplied Plaintiff with raw materials.

Plaintiff disregards the plain, ordinary, and generally accepted meaning of "*direct* supplier."[4]  Scheckenbach's sourcing companies are not Plaintiff's "direct suppliers."  Accordingly,

---

[4] "Direct" means: "1. going from one place to another without changing direction or stopping.  2. without intervening factors or intermediaries."  *Oxford Dictionary of Current English*, revised second edition, 12 June 2003, Edited by Catherine Soanes; *accord* BLACK'S LAW DICTIONARY 471 (7th Ed.) (defining direct as "straight; undeviating; free from extraneous influence; immediate").  To find that *any* provider of ingredients is a "direct" supplier would render meaningless the term "direct." *Cf. Archer-Daniels Midland Co. v. Phoenix Assurance Co. of New York*, 936 F. Supp. 534, 543- 44 (S.D. Ill.1996) ("The grain [at issue] is produced by the farmers and sold to grain dealers, who then sell it to ADM.  The farmers[, as] "indirect" supplier of the grain, . . . are a supplier nonetheless.  Had . . . the parties wanted to [specify] "direct" suppliers, they could easily have added language to that effect.")

6

any payments received by Scheckenbach's sourcing companies are not prohibited by the contact because they are not "gratuities, commissions, or fees from [Plaintiff's] *direct* suppliers."[5]

Having determined that Scheckenbach's sourcing companies were not Plaintiff's direct suppliers, the Court next examines Horizon's payments to Scheckenbach's sourcing companies.[6]  The contract prohibits Scheckenbach from receiving payments from Horizon, Plaintiff's manufacturer.  (Def.'s App. at 102.)  Given Scheckenbach's ownership of his sourcing companies and their receipt of payments from Horizon, the Court analyzes whether those payments are prohibited under the contract.

### b.  Payments from Horizon

The parties dispute whether the monies received from Horizon violate the prohibition against Scheckenbach "accepting or receiving any . . . fees from [Horizon] in conjunction with [Plaintiff's] business[.]"[7]  (Pl.'s App. at 8.)  Scheckenbach argues that the payments from Horizon were profits from the sale of raw materials, not prohibited "fees."[8]  (Def.'s Br. at 3-4.)  Plaintiff's

---

[5] Plaintiff takes Scheckenbach's argument to read that Horizon is Plaintiff's only direct supplier. (Pl.'s Resp. at 12.)  Such a position, Plaintiff argues, renders meaningless "the prohibition relating to direct suppliers."  (*Id.*)  Scheckenbach does not appear to argue that Horizon is Plaintiff's only direct supplier.  (*See* Def.'s Br. at 2-3.)  Scheckenbach argument is that Plaintiff has adduced no evidence that his sourcing companies are Plaintiff's direct suppliers.  (*Id.*)

[6] There is no evidence that the payments from Horizon were made directly to Scheckenbach. The payments, were, however made to Scheckenbach's sourcing companies. (Def.'s App. at 155, 157-58, 179.)  Scheckenbach's sourcing companies were owned exclusively by Scheckenbach and his wife.  (Pl.'s App. at 362, 365, 370.)  Therefore, any monies Scheckenbach's sourcing companies receive from Horizon, are effectively being paid to and received by Scheckenbach and his wife.

[7] Plaintiff did not respond to Scheckenbach's arguments that the receipts are not impermissible gratuities, or commissions.  (*See* Pl.'s Resp. at 8-11 (arguing the ambiguity of "fee" only).)  The Court construes Plaintiff's failure to respond as a concession.  *See Carter v. Johnson*, 131 F.3d 452, 464, 465-66 (5th Cir. 1997) (failure to raise an issue before the district court is deemed waived).

[8] Scheckenbach points to the context in which the contract was signed: in proximity to a similar contract with another consultant with a broader prohibition.  (Def.'s Br. at 4-5.)  The Court, however, need not review the context surrounding the agreement because the Court does not find the agreement ambiguous.  *See Interstate Contracting Corp. v. City of Dallas, Tex.*, 407 F.3d 708, 712 (5th Cir. 2005) (examining contract ambiguity in context of the surrounding circumstances); *Reliant Energy Services,*

argument focuses on an exception in the contract as a reference for understanding "fees."  (Pl.'s Resp. at 7-8.)  Plaintiff argues that the term "fees" was intended to encompass "any monies" Scheckenbach received in conjunction with Plaintiff's business.  (*Id*.)  Alternatively, Plaintiff argues that "fees" is ambiguous, thus creating a fact question precluding summary judgment.  (*Id*. at 8-11.)

With respect to the ambiguity of "fee," merely because other courts, in other jurisdictions, in other contexts have found "fee" to be ambiguous does not render it ambiguous as a matter of law.[9]  Nor does "[a]n ambiguity . . . arise simply because the parties advance conflicting interpretations of the contract."  *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 235 (Tex. Dec 31, 2003).  An ambiguity exists when the parties conflicting interpretations are both reasonable.  *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)  "Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered."  *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997) (citing *Columbia Gas*, 940 S.W.2d at 589 (Tex. 1996).

Here, there is no ambiguity because both parties' interpretations of "fees" are consistent and reasonable.  Plaintiff interprets "fee" broadly to include profits, salary,

---

*Inc. v. Enron Canada Corp.*, 349 F.3d 816, 821 (5th Cir. 2003) (same).

[9]  In *U.S. Fidelity & Guar. Co. v. Lightning Rod Mut. Ins. Co.*, the Ohio Supreme Court found "fee" ambiguous because it was unclear "whether a fee includes any 'compensation, or wage * * * for performance of *services*' or must be 'for a particular *act or service*.'"  687 N.E.2d 717, 719 (Ohio 1997) (emphasis added).  Under either construction, the payment is for a service or services.  Similarly, the ambiguities found by *Cincinnati Ins. Co. v. W. Am. Ins. Co.*, 112 F. Supp. 2d 718, 722-23 (C.D. Ill. 2000), and *Greany v. Branyan*, Civ. No. L-97-1076, 1997 WL 679512 at *4 (Ohio App. 6 Dist. 1997), did not dispute the service component of the "fee."  *See Cincinnati Ins.*, 112 F. Supp. 2d at 722-23 ("The fee paid covers the costs of [a service,] carrying property for a charge. . . . [Alternatively fee means] a salary based upon the round trip mileage of the rural mail route and the number of delivery points on the route [*i.e.*, a service]."); *Greany*, 1997 WL 679512 at *4 ("In one sense, the phrase could be broadly read to mean any type of payment made for the transportation of property [*i.e.*, a service]. . . It could also be narrowly interpreted to mean only the amount paid to an individual engaged in the business of transporting property [*i.e.*, a service provider].").

"compensation[,] or wage received by Scheckenbach for performance of services." (Pl.'s Resp. at 9.) Scheckenbach interprets "fee" to mean " a recompense for an official or professional service or a charge or emolument or compensation for a particular act or service." (Def.'s Br. at 4.) There is no evidence of a common industry understanding of the term "fees" different than its plain, ordinary, and generally accepted meaning. *See Zurich American Ins. Co.*, 157 S.W.3d at 465. Nor does the one page contract define "fee." (*See* Pl.'s App. 30.) Therefore the interpretation of "fees" is guided by its plain, ordinary, and generally accepted meaning which both parties agree on: payment for an act or service. *See Oxford Dictionary of Current English*, rev. 2d ed. (defining "fee" as "a payment made in exchange for advice or services"; BLACK'S LAW DICTIONARY 629 (7th Ed.) (defining "fee" as "a charge for labor or services, esp. professional services"); *see also id*. 277 ("compensation" as "remuneration for services rendered, whether in salary, fees, or commissions").

　　　　Plaintiff has offered no evidence showing that Scheckenbach provided any services to Horizon. The summary judgment evidence demonstrates that Scheckenbach, through his sourcing companies, sold goods to Horizon, not services.[10] (Def.'s Br. at 4; Def.'s App. at 155, 158, 161-79.) Nothing in the contract prohibits Scheckenbach from selling, at a profit, raw materials to any of Plaintiff's direct suppliers or manufacturers. Therefore, Scheckenbach's receipt of monies from Horizon, does not contravene the contract prohibition against Scheckenbach receiving "fees from

---

[10] Although Scheckenbach could be construed as having provided the "service" of procuring and distributing usable raw materials to Horizon, this argument is not made by Plaintiff, nor is it plausible given the common difference between goods and services. *See Propulsion Techs., Inc. v. Attwood Corp.*, 369 F.3d 896, 900-902 (5th Cir. 2004) (noting Uniform Commercial Code distinction between goods and services); *Z-Tel Comms., Inc. v. SBC Comms., Inc.*, 331 F. Supp. 2d 513, 547 n.2 (E.D. Tex. 2004) (noting Clayton Act distinction of goods versus services); *Park v. Nova Container Freight Station*, Civ. No. A.3:97-CV-1977-D, 1998 WL 684227 (N.D. Tex. 1998) (noting Texas Deceptive Trade Practices-Consumer Protection Act distinction of goods versus services). Scheckenbach may have provided his personal services to his sourcing companies and received fees therefrom. However, as discussed above, Scheckenbach's sourcing companies are neither direct suppliers to nor manufacturers for Plaintiff. Therefore, any fees Scheckenbach received from his sourcing companies are neither prohibited by or violative of the contact.

. . . manufacturers of [Plainitff's] products." Accordingly, Defendants' Motion is **GRANTED** as to Plaintiff's breach of contract claim.

### 2.        Breach of Fiduciary Duty

Fiduciary duties arise from the relationship of the parties. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997); *Bridges v. Metabolife Int'l, Inc.*, 119 Fed. Appx. 660, 663 (5th Cir. 2005). "But not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship. In order to give full force to contracts, [courts] do not create such a relationship lightly." *Schlumberger*, 959 S.W.2d at 176-77 (citing *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992); *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962)). "Fiduciary duties . . . extend only to dealings within the scope of that relationship." *Fuqua v. Taylor*, 683 S.W.2d 735, 738 (Tex. App.–Dallas 1984, writ ref'd n.r.e.).

Plaintiff argues that Scheckenbach owed fiduciary duties not enumerated in the contract. (Pl.'s Resp. at 13-16.) Plaintiff avers that by admitting his status as Plaintiff's agent, Scheckenbach has admitted the formal fiduciary relationship of principal and agent. (*Id*. at 13-14.) In no uncertain terms, Scheckenbach admits that he was Plaintiff's agent, but that the scope of his responsibilities as agent is delimited by the contract. (Def.'s Br. at 15) Scheckenbach argues that the scope of his fiduciary duties cannot exceed those duties enumerated in the contract. (Def.'s Reply at 7-9.) The contract, however, does not mention fiduciary duties.

The contract provides that Scheckenbach is to:

> consult with [Plaintiff] by telephone, in writing, or in person on matters relating to formulation of new products and reformulation of existing products, including researching and preparing the nutritional profile of the product, preparing new product labeling, and interfacing with laboratory personnel to develop finished product[s]; counsel existing and prospective [Plaintiff] endorsers as to proper and effective usage of products; serve as Vice-Chairman of [Plaintiff's] Scientific and Medical Advisory Board, working with other Board members on scientific issues

> affecting [Plaintiff's] product efficacy and safety; appear at [Plaintiff's] Success
> Schools three times per year, participating in the general and specific breakout
> sessions for doctors and coaches.

(Pl.'s App. at 30.)  Because Scheckenbach admits the agency relationship, and absent from the

contract is any mention of fiduciary duties, Scheckenbach owes Plaintiff common law fiduciary

duties.  *See Republic Bankers Life Ins. Co. v. Wood*, 792 S.W.2d 768, 778 (Tex. App.–Fort Worth

1990) ("The relationship between agent and principal is a fiduciary relationship."); *Matter of*

*Carolin Paxson Advertising, Inc.*, 938 F.2d 595, 597 (5th Cir. 1991); RESTATEMENT (SECOND) OF

AGENCY § 376 comm. a. (1958) ("Since the parties can make whatever [enforceable] agreement they

please . . . the rules stated in [Restatement (Second) of Agency] Sections 378-398 are . . . dependent

on the nonexistence of an agreement to the contrary.").

        The Texas Supreme Court has adopted the Restatement (Second) of Agency's

definition of common law fiduciary duties:

> The agreement to act on behalf of the principal causes the agent to be a fiduciary,
> that is, a person having a duty, created by his undertaking, to act primarily for the
> benefit of another in matters connected with his undertaking [§ 387].  Among the
> agent's fiduciary duties to the principal is the duty to account for profits arising out
> of the employment [§ 388], the duty not to act as, or on account of, an adverse party
> without the principal's consent [§ 391], the duty not to compete with the principal
> on his own account or for another in matters relating to the subject matter of the
> agency [§ 393], and the duty to deal fairly with the principal in all transactions
> between them.

*Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002) (paraphrasing

RESTATEMENT (SECOND) OF AGENCY §§ 387, 388, 391, 393).  Scheckenbach's citations to Texas

cases discussing fiduciary duties owed to joint venturers are inapposite as the instant litigation

involves fiduciary duties owed from an agent to a principal.

        Scheckenbach's argument that he is free to carry on activities outside the scope of

the agency, relies on the false premise that his activity of selling raw materials to Plaintiff's

manufacturer is beyond the scope of his common law fiduciary duties.  Because Scheckenbach's

fiduciary duties are governed by Texas common law, and Scheckenbach has not identified those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, Defendants' Motion is **DENIED** as to Plaintiff's breach of fiduciary duties claim.

### 3.     Fraud

Concealment of facts constitutes actionable fraud only where one has a duty to disclose. *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 859 (5th Cir. 2004); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986); *see Bridges*, 119 Fed. Appx. at 663.  "A duty to disclose [arises] in a commercial context . . . when there is a fiduciary relationship between the parties." *Citizen's Nat. Bank v. Lawson*, 142 S.W.3d 459, 477 (Tex. App.– Ft. Worth 2004, no writ).  A fiduciary relationship exists between and agent and his principal.  *See supra* III.A.2.; *Republic Bankers Life Ins. Co.*, 792 S.W.2d at 778.

Plaintiff avers that, by interposing his sourcing companies as suppliers to Horizon, Scheckenbach created a scheme to defraud Plaintiff.  (Pl.'s 1st Am. Compl. at 7, 10.)  Specifically, Plaintiff alleges that (1) "the actions of Scheckenbach and R-Squared in secretly receiving compensation from Horizon and/or Scheckenbach's sourcing companies, while concealing these material facts and conduct from [Plaintiff], constitute fraud"[11]  (*Id.* at 10) ; and (2) "Transglobal . . ., [Phytochemica], and HerbAsia were at all times material herein, Scheckenbach's alter egos used for the purposes of perpetuating an actual fraud on [Plaintiff]."  (*Id.* at 7.)  Scheckenbach challenges Plaintiff's summary judgment evidence as to both allegations, arguing the absence of: (1) a "duty not to receive such compensation [from his sourcing companies]" (Def.'s Reply at 12); and (2) a

---

[11]   In addition to its allegation of failure to disclose, Plaintiff alleges, in its Response, fraudulent affirmative misrepresentations.  (Pl.'s Resp. at 18.)  However, because Plaintiff's First Amended Complaint only alleges a failure to disclose under a fiduciary duty to disclose, the Court does not analyze the species of fraud not pleaded in Plaintiff's First Amended Complaint.

duty to disclose sales made Horizon.  As discussed above, *supra* III.A.2, Scheckenbach's agency relationship gives rise to his fiduciary duties.

Scheckenbach argues that Plaintiff's fraud claim turns on "whether Scheckenbach had a duty not to receive such compensation [from his sourcing companies]."  (Def.'s Reply at 12.) Scheckenbach avers that because his receipts from his corporations are not prohibited by the contract, then there is no duty to disclose such "immaterial" information.  (*Id.*)  The materiality of the undisclosed information, however, is not circumscribed by the terms of the contract.  "A 'material fact' is a fact which a reasonable person under the same or similar circumstances, would attach importance to in determining his course of conduct or action."  *Miller v. Miller*, 700 S.W.2d 941 (Tex. App. –Dallas 1985), writ refused n.r.e., (May 21, 1986); *see Smallwood v. Pearl Brewing Co.*, 489 F.2d 579 604 (5th Cir. 1974) ("[T]his Court held that the test of materiality is 'whether a reasonable man would attach importance to the [undisclosed fact] in determining his course of action.'  This definition, [is] born of the Restatement of Torts, § 538(2)(a)[.]")  Because "the issue of materiality may be characterized as a mixed question of law and fact," *TSC Indus., Inc. v. Northway*, 426 U.S. 438, 450 (1976), a fact question remains as to whether Plaintiff, in determining its course of action, reasonably attached importance to the facts allegedly omitted from Scheckenbach's disclosures to Plaintiff.  *See In re Sioux, Ltd., Sec. Litig. v. Coopers & Lybrand*, 914 F.2d 61, 64 (5th Cir. 1990), *overruled on other grnds by Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 359 (1991) ("materiality is a mixed question of law and fact, . . . ordinarily left to a jury.").  Accordingly, Defendants' Motion is **DENIED** as to Plaintiff's fraud claim.

### 4.     Unjust Enrichment

Scheckenbach summarily argues that Plaintiff's claim for unjust enrichment fails as a matter of law because Plaintiff cannot show that he was prohibited from receiving payments from

either Horizon or his sourcing companies.  (Def.'s Br. at 13.)  Scheckenbach posits that his enrichment or profiting at the expense of Plaintiff is not unjust because under the express terms of the contract such profits are not impermissible.  (*Id*.)  To prevail on its theory of unjust enrichment, Plaintiff "must . . . show that [Scheckenbach] had wrongfully secured a benefit or had passively received one which it would have been unconscionable to retain." *Matagorda County v. Texas Ass'n of Counties County Gov't Risk Mgmt Pool*, 975 S.W.2d 782, 785 (Tex. App.–Corpus Christi Aug. 1998).  "A party may recover under the unjust enrichment theory when [Defendant] has obtained a benefit from [Plaintiff] by fraud, . . . or the taking of an undue advantage." *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex.1992).

Scheckenbach admits to being responsible for ordering raw materials for the production of Plaintiff's products.  (Def. 4th Am. Answer at 3.)  Scheckenbach also admits that his sourcing companies sold raw materials to Horizon. (*Id*. at 4.)  Given Scheckenbach's admissions and because Plaintiff fraud claim survives summary judgment, *see supra* III.A.3., there remain material questions of fact with respect to Plaintiff's claim for unjust enrichment.  *See Heldenfels Bros.*, 832 S.W.2d at 41.  Accordingly, Defendants' Motion is **DENIED** as to Plaintiff's unjust enrichment claim.

### 5.    Indemnity

Under the Texas Products Liability Act,

> A manufacturer shall indemnify and hold harmless a seller against loss arising out of a products liability action, except for any loss caused by the seller's negligence, intentional misconduct, or other act or omission, such as negligently modifying or altering the product, for which the seller is independently liable.

TEX. CIV. PRAC. & REM. CODE § 82.002(a).  Section 82.002(a) "provides, among other things, that the manufacturer of an allegedly defective product must indemnify the seller for any loss arising out of a products liability action except when the seller independently causes the loss." *Meritor*

*Automotive, Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 87 (Tex. 2001); TEX. CIV. PRAC. & REM. CODE § 82.002(a). A manufacturer is therefore required "to indemnify an innocent seller for certain damages and litigation expenses arising out of a products liability action, but . . . sellers [must] bear the damages and expenses for losses they cause."[12]  *Meritor Automotive*, 44 S.W.3d at 88,

Scheckenbach argues that Plaintiff is not an innocent seller and therefore cannot seek indemnification from him. (Def.'s Br. at 22.) Scheckenbach, however, provides no evidence that Plaintiff independently caused the loss or losses for which it seeks indemnity. *See Meritor Automotive,*, 44 S.W.3d at 87, 88. Indeed, most of the underlying suits for which Scheckenbach seeks indemnification are still pending. (Pl.'s 1st Am. Compl. at 11-14.) With respect to the cases still pending, a ruling on the issue of indemnity is premature. As to those suits which have been tried, Scheckenbach provides no evidence that Plaintiff was found to have independently caused the loss or losses. Therefore, a fact question remains as to the proximate cause of the injuries against which Plaintiff is defending. Accordingly, Defendants' Motion is **DENIED** as to Plaintiff's indemnity claims.

**6.      Alter Ego Status of Scheckenbach's Sourcing Companies**

Scheckenbach moves for summary judgment on Plaintiff's allegations that Transglobal, Phytochemica, and HerbAsia are his alter egos.[13] Plaintiff argues that Scheckenbach, through the use of his sourcing companies committed actionable fraud.[14] (Pl.'s Resp. at 31-32; Pl.'s

---

[12]  The parties do not dispute that as designer or formulator of Plaintiff's products, Scheckenbach falls under the statutory definition of a manufacturer.

[13]  The parties do not argue or provide summary judgment evidence on the issue of BioSport's or Breakthrough's state of incorporation. Because the Court cannot determine which state each was incorporated in, the Court cannot analyze whether BioSport or Breakthrough were Scheckenbach's alter egos.

[14]  Plaintiff also alleges that "R-Squared and Scheckenbach are alter egos of each other used for the purpose of perpetuating an actual fraud on [Plaintiff]." (Pl.'s 1st Am. Compl at 6.) However, the relationship between R-Squared and Scheckenbach, is not the subject of Defendants' Motion. (*See* Pl.'s

1st Am. Compl. at 7.) Although the parties have not made clear the materiality of the alter ego issue, the Court nevertheless analyzes whether Scheckenbach is entitled to summary judgment.

"Federal courts look to the law of the state of incorporation to determine whether the corporate entity should be disregarded." *DDH Aviation, L.L.C. v. Holly*, Civ. No. A. 3:02-CV-2598-P, 2005 WL 770595, *6 (N.D. Tex. Mar. 31, 2005) (Solis, J.); *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 203 (5th Cir. 1995). Phytochemica and HerbAsia were incorporated in and are Washington State corporations. Transglobal incorporated in Oregon, but was merged into Phytochemica in 2002. Accordingly, the Court applies Washington law in its alter ego analysis of Phytochemica and HerbAsia, while analyzing Transglobal under Oregon law.

### a. Phytochemica and HerbAsia

Plaintiff's alter ego theory is grounded in Washington's doctrine of corporate disregard. (Pl.'s Reply at 30.) To prevail utilizing the doctrine of corporate disregard, Plaintiff "must demonstrate [1] that the corporate form was used to violate or evade a duty, and [2] that it must be disregarded to prevent loss to an innocent party." *Wash. Water Jet Workers Ass'n v. Yarbrough*, 90 P.3d 42, 58 (Wash. 2004). "With regard to the first element, the court must find an abuse of the corporate form." *Meisel v. M & N Modern Hydraulic Press Co.*, 645 P.2d 689, 692 (Wash. 1982). Among the examples of "an abuse of the corporate form" cited with approval by the Washington Supreme Court are:

> the failure to maintain minutes or adequate corporate records and the confusion of the records of the separate entities; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; . . . the absence of corporate assets, and undercapitalization; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; the concealment and misrepresentation of the identity of the responsible ownership,

Reply at 29-32; Def.'s Resp. at 18-20.)

management and financial interest or concealment of personal business activities; . . . the use of the corporate entity to procure labor, services or merchandise for another person or entity; . . . [and] the contracting with another with intent to avoid performance by use of a corporation as a subterfuge of illegal transactions[.]

*Id.* (citing Thomas V. Harris, *Washington's Doctrine of Corporate Disregard*, 56 WASH. L. REV. 253, 260 n.38 (1981)).

Plaintiff proffers the following evidence as proof of its theory: (1) exclusive ownership by Scheckenbach and his wife (Pl.'s Resp. at 31; Pl.'s App. at 362, 365, 370); (2) a Washington address for each corporation's principal place of business (Pl.'s Resp. at 31; Pl.'s App. at 367, 373, 375, 377); (3) the principal place of business addresses are private post office boxes (Pl.'s Resp. at 31; Pl.'s App. at 43); (4) the previous address of Phytochemica was a private post office box located in Oregon (Pl.'s Resp. at 32; Pl.'s App. at 46, 48, 217, 234, 251, 428); (5) each corporation was merged into successive corporations owned by Scheckenbach and his wife (Pl.'s Resp. at 31; Pl.'s App. at 370-72; 378-88); (6) the lack of depreciable assets relative to "substantial gross receipts" (Pl.'s Resp. at 32; Pl.'s App. at 220, 221, 237, 245, 254, 225, 271, 273, 288, 304, 322, 323); (7) each corporation's net income was passed through to the owners (Pl.'s Resp. at 32; Pl.'s App. at 350-53); and (8) consolidated accounting, *i.e.*, that Scheckenbach maintained sales and accounts receivables in a single record.  (Pl.'s Resp. at 32; Pl.'s App. at 354-61.)  The Court concludes that Plaintiff's evidence is sufficiently aligned with the examples of "an abuse of the corporate form" approved by the Washington Supreme Court to survive summary judgment.  *See Meisel*, 645 P.2d at 692 (citing W. Fletcher, Private Corporations §§ 41.2, 41.3.1, at 276 (rev. ed. 1974)).  Therefore, Defendants' Motion is **DENIED** as to Plaintiff's "alter ego" allegation concerning Phytochemica and HerbAsia.

### b. Transglobal

The standard in Oregon for determining alter ego status is straightforward. "It is a general principle that equity will disregard the corporate fiction for the purpose of preventing the successful perpetration of a fraud." *Amfac Foods, Inc. v. International Systems & Controls Corp.*, 294 Or. 94, 105-06 (Or. 1982); *Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon Ltd. Partnership*, 840 F. SUPP. 770, 779 (D. Or. 1993); *Martinson v. Andrews,* 347 P.2d 53, 56 (Or. 1959). Because the Court finds that Plaintiff's fraud claim survives summary judgment, to recognize the separate existence of Scheckenbach's sourcing companies would result in "perpetration of a fraud" if Plaintiff prevails on its fraud claim. *See Amfac Foods*, 294 Or. at 108 ("[S]ome form of moral culpability on the part of the [owner] is required before the [owner] will be held liable[.]"). Accordingly, Defendants' Motion is **DENIED** as to Plaintiff's "alter ego" allegation concerning Transglobal.

### B.    Defendant's Defenses and Counterclaims

### 1.    Laches and Limitations Defenses

Scheckenbach argues that the summary judgment evidence proves his defenses of laches and limitations as against Plaintiff's fiduciary duty, fraud, and unjust enrichment claims.[15] (Def.'s Br. at 13.)  In support of either theory, Scheckenbach points to correspondence between himself and Plaintiff's counsel as evidence that Plaintiff was aware, as early as July 2000, of Scheckenbach's "scheme."  (Def.'s Mot. at 7, 8; Def.'s Br. at 8, 9, 11, 13; Def.'s App. 93-99) Scheckenbach's evidence, however only establishes that Plaintiff sought disclosure as to vague interests Scheckenbach may have had which could conflict with Plaintiff's desired exclusivity of

---

[15]  Scheckenbach's Motion and Reply argue the affirmative defenses of waiver and ratification only as applicable to Plaintiff's breach of contract claim.  (Def.'s Mot. at 2; Def.'s Br. at ii, 9-10; Def.'s Reply at 16- 18.)  The Court therefore, does not consider these defenses as to Plaintiff's remaining claims.

Scheckenbach's services. (*See* Def.'s App. at 97, 98.) Scheckenbach's evidence does not implicate

Plaintiff's knowledge of the specific scheme alleged in its complaint.

Scheckenbach's defenses rely entirely on the proposition that Plaintiff was on notice

of his "scheme" as early as July 2000. (Def.'s Br. at 8; Def.'s Reply at 16.) Scheckenbach does not

argue alternate dates as bases for his laches and limitations arguments.[16]  Fraud and breach of

fiduciary duties claims in Texas have a four year statute of limitations. TEX. CIV. PRAC. & REM.

CODE Ann. §§ 16.004(a)(4), (5). Texas unjust enrichment claims have a two-year limitations period.

*Id.* § 16.003(a); *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 410 n.15 (5th Cir. 2004) (citing *HECI*

*Exploration Co. v. Neel*, 982 S.W.2d 881, 885 (Tex.1998)).

Plaintiff filed its claims on August 10, 2004. Scheckenbach provides no summary

judgment evidence that Plaintiff "discover[ed], or in the exercise of reasonable care and diligence

should have discovered, the" fraud and breach of fiduciary duties prior to August 10, 2000. *Harris*

*v. Am. Protection Ins. Co.*, 158 S.W.3d 614 628 (Tex. App.–Fort Worth Feb. 10, 2005); *Quinn v.*

*Press*, 140 S.W.2d 438, 440 (Tex. 1940); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453,

455- 56 (Tex. 1996). Scheckenbach's evidence establishes that as early as July 2000, Plaintiff

sought disclosure as to his relationship with Horizon. Based on the correspondence between

Scheckenbach and Plaintiff's counsel, there is no evidence that Plaintiff could have exercised any

more care or diligence to have discovered Scheckenbach's "scheme." Likewise, there is no evidence

that, prior to August 10, 2002, Plaintiff should have discovered that Plaintiff was receiving unjust

enrichment, through knowledge obtained in his position as Plaintiff's consultant, from sales to

---

[16]  Plaintiff admits to knowledge of its purchase of raw materials from Scheckenbach's company, BioSport in 1994. (Pl.'s App. at 5.) Plaintiff's only allegation as to BioSport's complicity is that "on informat on and belief, Scheckenbach also formed . . . BioSport in furtherance of his scheme." (Pl.'s 1st am. Compl. at 7.) Plaintiff's claims, however, do not concern the BioSport transactions; Plaintiff does not complain that Scheckenbach failed to disclose the 1994 transaction(s).

Plaintiff's supplier, Horizon.  Accordingly, Defendants' Motion is **DENIED** as to his statute of limitations defense against Plaintiff's fraud, breach of fiduciary duties, and unjust enrichment claims.

With respect to laches, Scheckenbach provides no evidence that Plaintiff "obtained actual or constructive knowledge of the asserted invasion of its rights" prior to August 29, 2000, when Scheckenbach entered into the contract.  *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1082 (5th Cir. 1997); *Doncaster v. Hernaiz*, 161 S.W.3d 594, 603 (Tex. App.–San Antonio Feb. 02, 2005) (citing *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 80 (Tex.1989).  Accordingly, Defendants' Motion is **DENIED** as to his affirmative defenses of laches against Plaintiff's fraud, breach of fiduciary duties, and unjust enrichment claims.

### 2.      Breach of Contract Counterclaim[17]

With respect to his counterclaim, Scheckenbach bases his argument on the premise that because none of Plaintiff's claims can survive summary judgment, then Plaintiff's termination of the contract constitutes a breach.  The Court, however, finds that fact questions remain as to Plaintiff's breach of fiduciary duty and fraud claims.  *See supra* III.A.2.,   III.A.3., III.B.1. Therefore, fact questions remain as to whether Plaintiff terminated the contract without cause, *i.e.*, whether Plaintiff is in breach.  Accordingly, Defendants' Motion is **DENIED** as to his counterclaim for breach of contract.

---

[17]  Because Scheckenbach owns R-Squared, *see supra* note 1, "Scheckenbach" hereafter refers to both R-Squared and Scheckenbach.

### 3. Indemnity Counterclaim

#### a. Corporate Regulations

Scheckenbach moves for summary judgment on his counterclaim that Plaintiff must defend and indemnify him for the products liability suits against him (as related to Plaintiff's products). (Def.'s Br. at 14-21.) Scheckenbach relies on the indemnity provision of Plaintiff's corporate regulations, the applicability of which Plaintiff does not dispute. (*Id*. at 16; Pl.'s Resp. at 33-35.) The parties dispute, however, whether Scheckenbach acted in good faith. (Pl.'s Resp. at 34-35; Def.'s Br. at 20-21 .) The indemnity provision is conditioned on Scheckenbach acting "in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of [Plaintiff]." (Def.'s App. at 87.) The Court concludes that because fact questions remain as to whether Scheckenbach breached his fiduciary duties and whether Scheckenbach committed fraud against Plaintiff, fact issues remain as to whether Scheckenbach acted in good faith. *See supra* III.A.2., III.A.3., III.B.1. Accordingly, Defendant's Motion is **DENIED** as to his indemnity counterclaim based on Plaintiff's corporate regulations.

#### b. Indemnity Letter

Scheckenbach also seeks indemnity based on Plaintiff's November 5, 2002, letter promising indemnity. (Def.'s Br. at 21.) Plaintiff's November 5, 2002, provides indemnity to Scheckenbach as a member of Plaintiff's Scientific and Medical Advisory Board. (Def.'s App. at 103.) To prevail on his motion, Scheckenbach must provide summary judgment evidence of "a claim arising from [his] service as a member of [Plaintiff's] Scientific and Medical Advisory Board." (*Id*. (Indemnity letter dated Nov. 5, 2002).) Scheckenbach points to *Wade Daigle et. al. v. Advocare Int'l L.P., et. al.*, Civ. No. 67-199428-03, Tarrant Co. 67th Dist. Ct. ("*Daigle* suit") as evidence of Plaintiff's duty to indemnify.

Both parties agree that in the *Daigle* suit, Scheckenbach was sued "because he was responsible for products formulation, testing, scientific research, safety and efficacy of [Plaintiff's] products." (Pl.'s Resp. at 37; Def.'s Br. at 19.) The parties dispute, however, whether Scheckenbach was sued as a member of Plaintiff's Scientific and Medical Advisory Board or in some other capacity, *i.e.*, as Plaintiff's consultant or agent. The parties' contract provides that Scheckenbach is to "serve as Vice-Chairman of [Plaintiff's] Scientific and Medical Advisory Board, working with other Board members on scientific issues affecting [Plaintiff's] product efficacy and safety[.]" (Pl.'s App. at 30.) It would appear, therefore, that in *Daigle*, Scheckenbach may have been sued in his capacity as a member of Plaintiff's Scientific and Medical Advisory Board, at least partly responsible for the efficacy and safety of Plaintiff's product. It also appears, however, that the "claims lodged by the Daigles go directly to Scheckenbach's duties" as Plaintiff's consultant. (Def.'s Br. at 20.) Therefore, a fact question remains as to whether Scheckenbach is being sued as a member of Plaintiff's Scientific and Medical Advisory Board. Accordingly, Defendants' Motion is **DENIED** as to his counterclaim for arising from Plaintiff's November 5, 2002, letter.

## IV.    Conclusion

For the foregoing reasons Defendants' Motion for Partial Summary Judgment is GRANTED in part and DENIED in part. Specifically Defendant's Motion is **GRANTED** as to Plaintiff's breach of contract claim. With respect to Defendant's remaining grounds for partial summary judgment, Defendant's Motion is **DENIED** as to:

(1) Plaintiff's breach of fiduciary duties claim;

(2) Plaintiff's fraud claim;

(3) Plaintiff's unjust enrichment claim;

(4) Plaintiff's indemnity claim;

(5) Plaintiff's "alter ego" claims;

(6) Defendants' affirmative defenses of laches and limitations;

(7) Defendants' counterclaim for breach of contract; and

(8) Defendants' counterclaim for indemnity claim.


SO ORDERED.

DATED: August 2, 2005.

_____
BAREFOOT SANDERS, SENIOR JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS